Morning. Welcome to the Fifth Circuit and these unusual ways to welcome people to the court these days. This is our second case of the morning, Pete Garcia versus City of Amarillo. Mr. Twing. There you go. May it please the court. Your Honor, I am going to address two issues. The first is on the issue of evidence of pretext regarding the district court's granting of summary judgment. I'm going to focus on the retaliation claim, but there's going to be some reasons the city has given for his termination. We believe the court committed error in two ways. First, in making the determination summary judgment was appropriate, the court impermissibly made a credibility determination, finding that the city acted had a good faith belief that Mr. Garcia had been insubordinate regarding some incidents that I'll get to in a moment, and that because of that good faith belief, there could not have been discrimination. As the court is well aware on a motion for summary judgment, it is not the time to weigh the evidence or determine credibility. It's a time to see, is there a fact issue, a material fact issue regarding the proffered reason? I believe we were all the way to the pretext stage, so I'm not going to walk through the prima facie case. With respect to evidence of pretext and whether there is a fact issue, we submit that first, the timing and sequence of Mr. Garcia's termination is highly suggestive and temporal proximity we recognize alone does not give rise to support a judgment, but the effective dates are September 1st of 2017. The city was advised through Mr. Garcia's attorney that he intended to file a charge of discrimination with the EEOC Texas Workforce Commission. He was off duty at this time due to a worker's compensation injury from a ruptured eardrum, so he didn't return to work and he returned on live duty the first week of November. So with respect to the events leading to his termination, we're actually looking at the first week of November to December 1st of 2017. In essence, just a little over three weeks. The incidents according to the city and examined by the court, there were three. We referred to them as the Packett incident, the station incident, and then the missed meeting incident. Packett incident occurred. Let me ask you one question. Yes, sir. When he came back off leave, the city, was there any indication they wanted to put him back to work, didn't it? Well, that was certainly the hope, your honor. Any indication they didn't want him back? Well, not until the Packett incident, and we believe that was very instructive because first of all, he was on light duty doing training. I mean, he asked for a change of station and they gave that to him. They did. Yes, sir. And then he went to a new station, and that's when he had the Packett incident, right? No, sir. The Packett incident happened before it was not at the station. It happened at a different location where he was doing training while on light duty. He was handed this packet with no real explanation. It contained policies that had nothing to do with light duty or the training he was undergoing, which in and of itself was odd because the city puts all of its policies online. Employees go online and read it and click acknowledging that they have read it. Secondly, the Packett didn't have any explanation as to what it was for. It had no place for him to sign, and it had no explanation as to what his signature meant. And given the fact that he already... Could you explain that for just a minute, Mr. Twain? Could you explain that? I'm not... I don't understand from what's in the briefing. What was he shown, a post-it note or something? What was he supposed to sign? Just the top of the... the very top page. Okay. Just put a signature on the first page of whatever is being signed? Yes, sir. Okay. And everything underneath. And given the circumstances, you know, he wanted time to review it and maybe review it with his attorney. And that's what caused, you know, the argument. But... Whether that was reasonable or not by the city, you have to create a dispute fact as to whether that is not... The city could not take that as an act of insubordination. It certainly was a refusal on his part based on, I think, undisputed facts to do what a superior was asking him to do. Maybe it was unreasonable. Maybe it was a variety of things. Well, that's... Why is that not usable as an act of insubordination regardless of the fairness of it? Well, your honor, we... We can stand that factually that's not correct, that he did not refuse to sign. He just asked for additional time to review it. And there's a contradiction... When the city listed this event, did they overlook that? Or is that part of what the city was indicating, that he refused to sign and wanted more time? Actually, the official document said he refused to accept it. The witnesses said that he had not refused to accept it and just simply had asked for more time. But in the issue of insubordination, let's say for the sake of argument, it was insubordination. They went immediately... The proposed discipline was indefinite suspension, which is just code for firing. So you have a 20 plus year firefighter that is being recommended for termination over a back and forth on a packet, which by the way, he was the only firefighter that was ever asked to do this. There's no evidence that... Would you accept that it's undisputed that he was the second firefighter for which this point could have come up? I mean, the city responds or the fire department, whatever, that there's somebody else who wasn't asked to sign. He later disputed whether he'd been informed of a certain new policy. So again, all this looks pretty minimal perhaps in the code record, but is that undisputed that there was this prior person and the city might then have had reason, the fire department, to require some sort of acknowledgement of receipt? Yes, sir. That is disputed because the circumstances are not the same. And in the context of him having given notice of an intent to file a charge, raises considerable questions regarding the fire department's motive and whether, in fact, they were attempting to provoke him into response that they could later use as a justification for he returned to work. And that would take us to the second incident. That's the station incident. And he was on suspension at the time. It is disputed. There's a dispute whether he was ever told that he couldn't go to the station. Mr. Garcia has made it very clear that he was never instructed that. And there's certainly no writing or any notice that he was not to the station. Let me ask you about that just to get this fact straight. What is the basis in the record for the two different views? You have your client making a statement, a contrary statement, about what he was told. Is there an affidavit? Is there a deposition? Where do we know what the fire department says they told him on this? How do we know? On this? Just their witness testimony. Okay. And, Your Honor, let me, don't say this by way of excuse, but Emerald's downtown had a powered outage. So I had to hustle to get home to be here today. And I inadvertently left my document binder in my office. So otherwise, I'd be able to flip to and give you a reference. And again, that's not by way of excuse. That's an excuse and it's a good one. Well, since the city fire department is part of this, they can confirm. But on the station incident, Mr. Garcia, you know, there's a written policy that requires firemen to check their email on a regular basis. He was unable to check his email from home. So he goes to the station, finds the officer on duty, asks permission to go in and check his email. He, in fact, went and checked his email. And another deputy chief sees his car, Mr. Garcia's car, confronts Mr. Garcia in public about being in the station. The argument was whether or not he was ever instructed to go into the station or not. And there was an argument. Ultimately, Mr. Garcia was ordered to leave. And again, the proposed discipline was to put him on indefinite suspension, i.e. firing. Which brings us to the third incident. I'm going to be running low on time, so I want to get to it. Was the so-called missing meeting. And this was the incident that the city briefed to the court and the court found was the final straw. This was the reason why he was fired. The fact issue there and the problem with that argument is that the termination paperwork was prepared the day before the meeting. And that's in the record. So it's more than reasonable that the meeting was to tell him that he was fired. And there's also a fact issue as to why he missed the meeting. Mr. Garcia testified that he needed to get the, he wasn't feeling well, I'm sorry. He wasn't feeling well and made arrangements not to attend. Chief Greeley's testimony is that he told him he had to the there is more than sufficient evidence, at least for a fact issue. But the fact, but the district court didn't even examine pretext. And for that reason, we believe that was reversible error. In the few minutes I have remaining in my first argument, I mean, my case in chief, that's on the state. One thing about the pretext. Yes, sir. You say he'd been recommended for an effect termination. Yes. And that recommendation been signed off on by the by the chief who he was supposed to meet on that last day. Well, we don't know what the meeting was. But yes, sir, there was a report that was made about the incident. And the recommendation was in those report. It's it's called a significant incident report. And the recommendation was made by somebody lower than the chief in the chain of command. That is that is true. That is correct. So the chief had never made any announcement of what he was going to do that recommendation. No, sir. And on the on the administrative exhaustion, I'm just gonna make two quick points in a couple of minutes I have. The central issue there is the the fact that the district court did not evaluate the agency pleading filings under state law. The first document was filed with the EEOC. It was considered duly filed. So it was considered to have been accepted by the TWC. The contents met the requirements of the state statute, although there were there were some things lacking. But the court only the court focused on what Mr. Garcia actually wrote and the statement that he attached. But he didn't look at the contents of the form. And the contents of the form showed that he was alleging an unlawful discrimination practice, alleging retaliation. It identified the respondent and identified the individuals involved. Now, state law has the state statute has a relation back doctrine that would allow for not only the correction of technical errors and missions, but also to amplify and add additional detail if necessary. We filed with the EEOC a follow-up form five on June 29th. And we maintain that that document related back to the December 2017 filing for purposes of curing any defects that were in that chart. And I would point out that this is particular this case shows particular problems when the agencies do not act. When they do not follow up, they do not investigate, they do not contact the complaining party or their attorneys, you know, to flesh things out. So the relation back doctrine. I'm sorry, I'll stop. That's fine. You can pick up on that just a bit and we borrow your friend on the other side has notice of it or you can also discuss anything else you want. Ms. Lynn, it's your turn. You're muted, Ms. Lynn. Now you're not. Hello. Hello. Good morning. Morning. Thank you for this opportunity. I'd like to start your honors with the last argument about the relation back on further extensive research as we were working on this. There's something many things in the legal side that Mr. Twain inadvertently appears to have overlooked. And that is based on the state law and this relation back theory. In 2010, the Texas government code was amended in section 311.034 and it specifically states there's no immunity for public employers, of which we are, where there's any prerequisites to a lawsuit and including notice. And in 2012, the Texas Supreme Court issued a decision in Prairie View A&M versus Chadha and basically said this was a discrimination claim where there was attempt to relate back similar to what's in this case, the Supreme Court said that the section 311.034 does not permit relating back. Therefore, all the argument and all the documentation and all the cannot be. And the judge ruled that in his opinion early on. And he is spot on on that. This was later in 2014, Sugar Land versus Kaplan out of the Houston Court of Appeals had the same issue and Sugar Land is also a city and that was a no pet case. And so, what that means is that Mr. Garcia cannot resurrect a claim because they're untimely. And then our judge ruled and rightly so that the EEOC charge was untimely because it was not filed until June of 2018 so that it could not relate back to all the things that were attempted to and that's pretty important because that changes the whole arena of what this panel would be looking at. And so, I'd like to address next the idea of not relating back because it's untimely. And the other thing that I wanted to mention is that in all the documents that were attached there in the intake questionnaire, that's a really important point for the court in our opinion to tackle because they're trying to get all these facts in through the intake questionnaire. And that's when one of the documents that we submitted, it's in ROA 971 through 75, and there's a list of the different factors that a person could put the X on. And it's interesting that Mr. Garcia, who filled that out, did not at all mention that his firing was due to his disability. He admitted that. He had every other category but not disability. So, since number one, it doesn't relate back and number two, he didn't indicate disability at all, those are the two of the reasons that the court ruled against and dismissed the case. The other part that is troubling is that the, was the actual authenticity and the notary signature because a charge or discrimination has to be signed in front of a notary. And if you'll look at, we're at ROA 975 and also 971, you'll note that the document that Mr. Garcia signed, he dated it 12-13. The notary signature isn't until December 15th, two days later. And the requirement under federal law and state law is that you sign your complaint in the who provides, excuse me, the notary is the one that provides the oath that it has to be sworn. And also, of course, that was, that whole charge was bereft of facts that related to the facts that you've been discussing with the other counsel. There's also a case that's called Stevenson versus Sprint in 2008 that squarely discusses this problem with the verification where you're trying to relate back. And so, we believe just as preliminary that those, that the whole procedure here, the district judge found correctly, was it done correctly, the judge found that the other, that the actual occurrences here were not correct. And that's the reason he concluded, and he didn't have to go to the rest of the opinion, but he concluded that it was untimely based on what I've just discussed with you. And I'd like to move next to the retaliation, the but-for test. There's a claim that wasn't is the test, but it's very clear that in 2013, the United States Supreme Court changed the factor when you're looking at whether there's retaliation from the motivating factor to a but factor. This was followed up by the Texas Supreme Court in 2018 in a case called Alamo Heights, and the Texas Supreme Court followed along with the Nassar case. And that has been um, had a case called Wallace v. Steeton, and I can send those sites if you would like. Also, notice, take acknowledging that it was a but-for standard. And so, the grievances that were challenged in the documents that we've been discussing were not related to a protective category, and his grievances were about poker playing, and he didn't like his captain. And the district court also correctly noticed that, that it had nothing to do with age, it had nothing to do with disability. And in fact, the other thing that the court pointed out, rightly so, was that he didn't become disabled until the day of the horn honk, and that day is April the 15th. So, all those other things preceded that. So, you start really at April 15th, and I'd like to take you through that, and I can tell by your questions that you're familiar with the facts, and that is that Mr. Garcia was absent from the city for most, much of that time, recuperating from his injuries to his ear in San Antonio at his request, because he had been told and it's probably true that some of the best ear doctors are in San Antonio. And so, he was number one permitted to do that. That doesn't seem retaliatory to me or to the city. And the second thing that, I'm kind of jumping around, but it relates more in time, was a claim that his grievance was never resolved, and you probably read about that in all the briefing. It was very most of that time in San Antonio, so it's not surprising that the grievance was not handled according to the strict standards of the city's grievance procedure. However, and if I have time, I'll mention later that it actually was worked out. So, all of this leads up that there could not have been any predetermined idea to fire Mr. Garcia. For all his time, he was on full pay by the city. He got the best of the treatment from the doctors, and we had some exhibits that we filed a motion to admit to the record because we exceeded the number of pages. And one of them, and I would move for admission, was a copy of a receipt, an invoice from a hearing company in San Antonio that showed the price of the hearing aids that he was supplied with that were at the city's expense. So, going on and to full pay, and he was finally released to come to work, and he was to come to work, and at first he had a limited duty, and that's when the city asked him. He'd been gone six months. The city was updating all the fire department policies, and realizing that the fire department is a paramilitary organization, I think that's really important in understanding the insubordination that occurred at a later period of time. So, when he received the approval from his physician, he reported to work. He was put on the OJI type of, he didn't have to go to the station yet because the department wanted him to familiarize himself with their documents, and that's where all heck broke loose from that. I'm trying not to create fact issues. I think Mr. Twing, in his presentation, was creating, trying to create some fact issues, but a reading of the documents and the briefs that we've submitted would indicate there was not any kind of problem there. One of the things that you will note, I'm going to back up here, was this letter from Mr. Twing that was September 1st. I recall that, and you may have heard this term before, a defensive shield. For whatever reason, his client must have felt that he was going to be in trouble for something. So, this letter was a letter to the city attorney saying, you know, terrible things have happened to my client, and that related to the whistle in the air, the horn honk in his ear. So, it didn't really relate to anything other than that, which the trial judge says isn't really a part of this anyway. But moving on, what happened at that point is that the city, you know, he has this letter, which seems like a protective shield, and going on forward, everything worked fine. He went back to work, and he received that partial release. He was put on the light duty, but still on the job type of work, and you asked a question, and I think it was important, and I'd like to resolve that. He was asked to sign for a packet. They had a program you may have heard of before called Lexipol, where they could access him on computer. Now, and I will also mention about computers. Employees in the fire department did have an order that they were to review emails, but it was when they were at work. Firefighters, as you may know, work only every third day. So, there was no expectation that he would have to go to any fire station to review emails on any particular day, notwithstanding what Mr. Twain may have said a few minutes ago. So, what would you say to the concern that the district judge on that point made an improper fact-finding about what the plaintiff was told? His explanation did not suggest he was told, don't check your email. Just don't come to work to the fire station. So, a misunderstanding, maybe, or whatever the explanation may be. Your witnesses say he was told not to come in at all. So, there's at least a disagreement there. Why does that not matter in your view? Actually, it's two different things. Let me explain. The order not to go to any station was because after the meeting with, that was top management, that meeting with top management had, with him walking out and slamming the door behind him and refusing to do anything, that was when he was told don't go anywhere. They didn't want him to go try to do training at any station. So, that was when he... Just stop there. I mean, we're talking about resolving at this stage in the proceedings. Is there any disagreement about what he was told as he slammed the door walking out? I don't believe there's any disagreement, but there was one more thing that he was told that Mr. Twain didn't mention to you before he left, and it's on, it's on the tape that was part of the evidence, because he was secretly tape recording the other, the officers, the high officers, is he was told, I'm putting you back on OJI. Here, you take the packet and you go talk to your lawyer about it. So, if they were trying to retaliate against him, but not of even putting back on OJI, they would have probably put him on leave without pay, which they could do, and they wouldn't have said, here, you take the packet and let your lawyer look at it. We'll put you back on leave, and after he looks at it, then everything is good. And I think you all also heard the reason for wanting the packet was that the prior, one of you mentioned that the prior incident with another employee where he hadn't signed it. So, everyone there was trying to help him out. They had him assigned to a new station, they had his training worked out, and everything was going well until he, we use that term, bowed up about having to sign that he received the packet. And I don't think that creates a fact issue that that would require any type of trial about it, because he clearly, he clearly understood what he was asked to do, and he had no reason, that was a legitimate reason, no reason not to follow that order. And the insubordination was included, how he left the meeting, which was in a huff and slamming the door and that type of thing. That was the first incident of the insubordination. And one of the other things that Mr. Twain didn't mention is that Mr. Garcia had a history of counselings about not getting along with people, and this kind of goes to that question of retaliation. Did the chief just dream this up? He had a history of, and had been moved around in a lot of stations, and one thing I would like to mention as I'm getting over into the insubordination and the good faith and the time remaining, is that when they had the incident at the station, Mr., and it wasn't used against him, but it's just another factor, we had evidence that Mr. Ramirez, the other person on the truck, was threatened by Mr. Garcia on the top of the truck and also assaulted and was given a titty twister by Mr. Garcia there at the station. I'd like to turn, if I may, to the honest belief, and I, of course, the city agrees with the trial court's honest belief because of the factual history I've given you, there was actually no discrimination, and the fire chief had an honest belief that all of these had occurred. He was present too, and the one that occurred at station five, the chief was on the phone with Mr. Garcia, and Mr. Garcia said, I'm not leaving here, and you're going to have to call the police if you want me out of here. Ultimately, he changed his mind, and the chief fortunately didn't have to call the police to come in. There's no proof at all in the record of any bad motive that the chief had. The chief's a pretty laid-back guy. He could have fired him back, as I mentioned, in May because of the incident there at the fire ground. The chief was involved with two of the three issues here that constituted insubordination. He was not at the first meeting, but he was involved and on the phone with Mr. Garcia at the second one, and then the third issue was Mr. Garcia's refusal to follow the directive to come to the station to have the predetermination noticed. I did want to mention, because it's not in the record, that under Texas law, before a fire chief can terminate or discipline an employee, they must be given notice under chapter 614.021 of the Texas government code. This requires a written notice, and it can be given before you terminate someone. It can be given at the time you terminate, and in the record, there is that notice of intent to fire him, and he didn't come to the meeting. Whether he anticipated the firing was going to happen and just decided he wasn't going to come, I have no way of reading his mind myself. When they called him, he said he was going to come in. He would insubordination. The city agrees with the trial court in that respect that that honest belief that the chief had that there had been insubordination on not one, but three occasions, and because of the fact that the fire department is the paramilitary organization, I'm sure that would agree that there has to be obedience to orders, and whether you like the order or not, you're supposed to take action as you're ordered, regardless of whether you agree with it or not, unless it's dangerous to your health or your safety or the safety of others. We believe that the judge got this case right. We believe that, first off, it's knocked out as a legal matter, that factually there's no reason for a trial at all. I appreciate the opportunity to speak with you, and if there's any questions, I'd be happy to answer them. Let me ask you this. What do you say to counsel's argument that after incidents one and two, the recommendation went forward for, in effect, a firing, so that got a 23-year employee, and he refused to sign a packet, for example, and the fact they recommend firing looks suspicious. Yes, your honor, I think it does, but I didn't really get a chance to get back in the history, except that I did mention trying to advise about suspicion of the incident that had occurred at the fire scene back in April with firefighter Ramirez and the treatment that he gave him, and he'd had many run-ins before, and he did have 23 years. I'll grant you that, but I think that when you're looking at insubordination, all of the decisions, and I handle a lot of decisions related to terminations in the fire and police services that insubordination and untruthfulness are viewed by all arbitrators that we deal with, and judges usually, that those two are the capital punishment, and even one instance of insubordination can become a valid termination from employment because it's seen as so serious. For that reason, the idea of progressive discipline was not going to work here. The chief had decided that based on these issues that had arisen with Mr. Garcia that he was not interested in changing his behavior and following orders. He wanted to run his own department life himself and not be bound by following anyone else's orders. Thank you very much. Thank you, Ms. Lynn. Five minutes for rebuttal. Thank you. Thank you, Your Honor. A couple of quick matters. First of all, we agree that but-for causation standard applies to the retaliation claim. That was never in question. In fact, we made that very clear in our briefing. A couple of things. Council pointed out that, again, we're back to good faith belief that the court determined that's a credibility weighing. He has to get into the mind and motive of someone to make that determination. It also involves weighing the evidence. By doing that, he did not adequately address the pretext issue, and he did not examine the pretext issue in the context of whether a fact issue, i.e., a reasonable juror could find the city's proffered reason is unworthy of belief or just outright false. Now, going back to the packet incident, council brought up the tape evidence that he was allowed to take it and go get it looked at. That was after there was some back and official report that said that he refused to take the packet when, in fact, that was not the case. We have a contradiction in the position and the documents. Again, part of our reading of the evidence is that when he came back after getting an attorney, really and truly, everything up to that point doesn't really weigh on this case. He enters an appearance. I sent a letter on September 1st. What council did not tell the court, and by the way, this is on 904, is that I invited the city to try to get the matters resolved. We did not threaten suit other than we have an intention to file, but we want to work it out, and that was the discussion between the city and I up to the point where he came back on light duty, but there was some strain of trust given the history up to that point. With respect to the past and having trouble, one thing that needs to be pointed out, first of all, I don't know what paramilitary means. I mean, that sounds good. It's paramilitary, but my client was a Marine. He understands full well what insubordination is. He understands full well what following orders are. We're not talking about matters, let's say, while they're responding to an emergency, they're fighting a fire or acting as an EMT. I mean, this is purely administrative, and under council's argument, if one of his deputies came in and told him to go stand in the corner and he refused, that would be insubordination. Now, that may be insubordination in the Marine Corps, but I don't know that that is insubordination in a fire department. Council's argument also glosses over the fact that in those 23 years, Mr. Garcia's performance evaluations were always good or stellar. He had one performance evaluation that was bad in his entire career at the city, and it was filled out after he was fired. And that alone, I think, would raise considerable questions in the mind of a reasonable juror as to why you take a 23-year-old or 23-year-old veteran who's, you know, served, he's got good performance evaluations, and literally within a few weeks of returning back after retaining an attorney and trying to assert your rights, you're terminated. And lastly, with respect to the emails, if you look at the city's directive 963, it instructs every firefighter to check their email daily. And he's having this back and forth and being told he's being insubordinate, but yet he has a written directive from the fire department telling him to check his email. He could not check his email from home, and he went to the station. But he didn't just go barging in. He showed up unannounced. He showed up, asked permission, and in fact went and checked his email. That's all he did. The provocation that came, by the way, well, that's all I have here. Finish your thought, Mr. Tweed. The provocation about calling the police was not Pete Garcia. He had been threatened with arrest by the deputy chief that had confronted him publicly at the station. So at the end of the day, you know, there's a dispute about that. I mean, the more we look at it, but these are material facts. What was the motive? Was it proportional to what was going on? And was the initial recommendation of punishment proportional to the incidents we were talking about? All right. Thanks to both of you. I imagine there are adversities for everyone involved, perhaps today. Mr. Twing, in particular, racing home, if I understood what you were saying earlier. So we were able to carry on and manage with this case. We will take it under advisement. That is our last argument for the week. We are adjourned.